Packard v. Stevens.

RALPH G. PACKARD

v.

C. ARMORY STEVENS et al.

[Filed September 30th, 1899.]

1. The complainant made several contracts for the filling in of League Island by the defendants, agreeing to pay each according to the number of cubic yards of material deposited on the island, to be ascertained by a measurement in place, on completion of the work. Each knew of the other's contract and of the method agreed to be followed in computing the compensation. Through the neglect of the defendants, a confusion of their deposits was occa-

sioned, so that each claimed payment for so large a quantity that the sum of their claims admittedly exceeded the total amount deposited. The complainant is ready to pay for the total quantity deposited, but, because of the confusion and the consequent dispute between the defendants, does not know in what portions to distribute the total sum to the defendants.—*Held*, the complainant's interpleader bill will be sustained.

2. Where in such case each disputant insists that a certain base line is absolutely accurate to delimit the work done by the other, and admits that it is accurate to delimit his own work, save as to certain claimed exceptions, the burden of proof of the extent of the exceptions lies upon each party who asserts them.

3. On failure to carry the burden with such certainty that the quantity within the exceptions can be computed, the admitted base line separating the great body of the work done by each will be taken as the guide in ascertaining that portion of the whole which each has deposited in place.

On bill, answer and proofs.

The bill in this case is filed to restrain the Hydraulic Dredging and Improvement Company, one of the defendants, from prosecuting a suit at law against the complainant and to compel both the defendants to interplead and settle their respective rights to compensation for work done by filling in the United States government lands on League Island, in the Delaware river.

League Island lies near the Pennsylvania side of the Delaware, at the mouth of the Schuylkill river. In a state of nature it was elevated but little above the level of high water. Its greatest length lies nearly east and west, its southern side fronting on the Delaware and its northern upon what is called the "back" channel. Prior to the happening of the events which gave rise to the controversy under consideration, the United States government had located one of its navy yards on the western end of this island, and had on that end considerably raised the level of the surface and there placed its buildings and shops. This portion of the island was separated from the remainder by a wall or bank.

In the year 1891 the government began to fill in that portion of the island not included in the navy yard, and in that year and in 1892, under its direction, there was some deposit of

Packard v. Stevens.

filling made on that side of the island nearest the Delaware, raising the surface to some extent. It was determined to fill in the whole area of the island not included in the navy yard to a uniform level by depositing mud, sand and other material which was being dredged from the bottom of the Delaware in the course of the improvement of the channel of that river.

A contract had been made by the United States with the American Dredging Company for the improvement of the Delaware river, and as part of that contract, for the deposition on the island of material dredged from the bottom of the river. In carrying on this work that company made a sub-contract in 1893, with Ralph S. Packard, the complainant, to perform that part of the contract which required the filling of League Island. This contract with the complainant, was made under, and imposed upon him the same conditions and provisions, as were specified in the contract with the government. Payments were to be made by the company to the complainant as the government should pay the company, and the contract contained a provision that if the complainant should fail to keep its requirements, the dredging company might put additional force on the work and pay the expense thereof from the moneys to come due to the complainant.

The latter, on July 24th, 1893, employed the defendant C. Armory Stevens to make the "fill" according to the requirements of the United States officers in charge, payment to be made upon their measurement of material in place at ten cents per cubic yard, ninety per cent. to be paid as the work progressed and as the complainant was paid by the dredging company; the balance upon completion of the "fill" and payment by that company. Stevens began the work about September 1st, 1893, but did not progress with the required rapidity, and the complainant obtained from him, on the 7th of that month, a written consent to employ the dredge belonging to the defendant the Hydraulic Dredging and Improvement Company for such time as might be necessary to secure a performance which would comply with the requirements of the preceding agreements, and to pay the defendant company the price of eleven

cents per cubic yard for all material deposited and measured in place on the island, as determined by the United States engineer department, out of any moneys due or to become due to Stevens under the complainant's agreement with him.

On September 7th, 1893, the complainant alleges that he made a verbal agreement with the Hydraulic Dredging and Improvement Company, through its vice-president, Mr. Frank Somers, to fill in the island as required by the above-named contract, at the price of eleven cents per cubic yard for all material deposited and measured in place on League Island, as determined by the United States engineer department. Mr. Somers was the vice-president and chief executive officer of this defendant company, and he so entirely acted for it in all the matters herein discussed that all the witnesses refer to the company's work as that of "Somers," and to avoid confusion I will adopt the same method. The complainant alleges that in making this agreement he submitted to Somers the above-named written consent of Stevens, and that this formed the basis of the agreement between the complainant and the Somers company.

That company admits its employment under this contract to work for such time as might be necessary to enable the complainant to comply with his original contract. It also admits that the price to be paid it was eleven cents per cubic yard for material deposited and measured in place on League Island, as determined by the estimate of the United States engineer department, but it denies that it had any knowledge of the written consent of Stevens authorizing Packard to employ the Somers company to perform the work, and further denies that the consent formed the basis of the contract between the complainant, Packard, and the defendant company, and denies that it knew of or had any dealings with Stevens in the transaction.

Immediately that the Somers company had made its contract on September 7th, 1893, with Packard, the complainant, it began the work of placing the filling material on the island. The following general outline plan taken from *Exhibit C 3* will afford an illustration of the locality.*

---

*See original opinion on file.—REP.

The whole field to be filled up was so extensive as to be referred to as containing a number of acres, the exact quantity not being stated. There was a containing wall around this part of the island. The portion fronting on the Delaware was built of stone and that on the back channel of mud. The filling material consisted of mud and sand, in much the greater part dredged from the channel of the river, loaded upon scows, which were floated to places opposite the Delaware front of the island, where large holes or basins had been dug in the bottom of the river. The mixed material—mud and sand and water, and sometimes stones—was dumped from the scows into these basins, and was thence pumped by the defendants' machines into pipes laid across the containing wall and discharged upon the area to be filled. The material was so mixed with water that it flowed from the vent pipes and distributed itself, by the force given it by the pumping and by gravity, over the surface of the island. That part which lay on the south side of the island, nearest to the wall, being somewhat higher because of the previous filling, the softer material and water there deposited flowed towards the north side, where a sluice or overflow was fixed, through or over which the accumulated water was permitted to escape into the back channel, the mud and sediment remaining on the island. As the work progressed the deposit of mud and sand increased most rapidly near the south wall, and of course the softer material and water ran in greater quantity towards the lowest point, which was on the north side, and during the period of the working formed a large pond of some acres in extent.

Mr. Stevens' machines consisted of a hydraulic dredge, the "Leo," and a pulsometer, a machine which pumped a larger portion of solid matter than did the dredges. Mr. Stevens' machines deposited material upon the eastern portion of the island and were there engaged when Somers began to work. The hydraulic dredge "No. 4" was Somers' machine, and though it several times changed the place from which it pumped, yet it at all times deposited its material upon the western portion of the island. All the machines were located as indicated on the map.

When Somers began work there was neither fence nor bank to separate and keep apart the material pumped by Stevens from that pumped by Somers. They both worked without even any division line until August, 1894, when, on Somers' complaint that material pumped by him was mixing with that pumped by Stevens, Mr. Packard, the complainant, suggested that Somers build a bank and fence across the island from south to north at about the place indicated on the map, dividing it into an easterly and a westerly portion. This cross-bank began at the south wall and ran in a generally northerly direction for but a short distance.

Somers built a fence of ordinary boards, nailed horizontally upon 3 x 4 posts, driven three or four feet in the mud. The fence ran from the northern end of the cross-bank in the same northerly direction to the containing wall along the back channel near the sluice. This cross-bank and fence were intended to keep upon the westerly side the material pumped by Somers' machine and that pumped by Stevens' machines upon its easterly side.

At this time the quantity of material deposited along the westerly side of the fence by the Somers machine appears to have been so much in excess of that deposited on the other side by the Stevens machines, that in about a week a portion of the fence, under pressure from the Somers side, gave way toward the Stevens side, and it is claimed by Somers that material pumped by his machine flowed through the break upon the Stevens side. At a later date, when the cross-bank had in part been washed away and both bank and fence in part obliterated by filling up to its height, it is claimed by Stevens that material pumped by his machines overflowed upon Somers' territory. This process of successive overflow from one side to the other is insisted by each to have happened at several periods of the work, each claiming that the other received a greater overflow than came from him. The original filling done by the disputing parties under their contract has long been covered over by the later work done under other contracts, so that if there ever was a possibility of ascertaining the quantity of material contained

:in these overflows with accuracy it was lost before the controversy in this case arose.

In July, 1895, the whole work under the contracts had been completed, and the United States government engineer officer, under the terms admitted to be contained in all the contracts, computed the total amounts of the material put in place. This computation is accepted by all the parties and admitted by them to be correct, as to the total amount of material in place on the island, and there seems to be no substantial dispute in the evidence that the additional computations, estimating the amount of material put in place on each side of the line of the cross-bank and fence, were also substantially correct. These estimates state the amount of material put in place to the eastward of the line of the fence, &c., where Stevens worked, to be four hundred and fourteen thousand six hundred and eighteen cubic yards, and the amount on the westward of that line, where Somers worked, to be seven hundred and forty-four thousand and seventeen cubic yards. What was disputed, and that with great energy, was who should be paid for this work. Stevens insisted that about thirty-five thousand cubic yards of the material pumped by him had overflowed to Somers' side of the fence, and Somers that more than thirty thousand cubic yards had gone over from his side to Stevens'. While the dispute was in this position, in July, 1895, the complainant paid Stevens the amount due him by the engineer's estimate for the number of cubic yards of material in place on the east side of the fence, reserving the price of thirty thousand yards therefrom, because of Somers' claim. Shortly afterwards Somers notified the complainant that he claimed that the overflow from his side was still larger, and that it amounted to thirty-seven thousand three hundred and seventy-seven yards, and an additional quantity unstated, of "backflow," at the north side of the island.

On the basis of the calculations made by the government engineers, of the quantity of material in place on each side of the fence, allowing to Stevens the right to be paid for the whole of the portion to the easterly of the fence, and crediting prior payments to him, the complainant had in hand a balance due

Stevens of $2,713.24; and allowing to the Somers company the right to be paid in full for the material in place on the westerly side of the fence, the complainant had in hand for the latter company, after crediting prior payments, a balance of $243.27. Neither of the defendants was willing to accept payment upon a basis which ignored the claimed overflow of material. Some efforts were made to settle these disputes by an amicable interpleader suit, but they failed, and in January, 1896, the Somers company sued the complainant in the supreme court to recover for sixty-eight thousand seven hundred and thirteen cubic yards put in place, amounting to $7,558.43. Upon this the complainant filed his bill against both Stevens and the Somers company in this case, praying that they might be required to interplead, and that the suit at law by the Somers company might be restrained.

*Mr. William H. Corbin,* for the complainant.

*Mr. Peter V. Voorhees* and *Mr. Henry N. Paul* (of the Philadelphia bar), for Stevens.

*Mr. Frederick A. Rex,* for the Hydraulic Dredging and Improvement Company, or Somers company.

GREY, V. C.

The first question to be determined is whether the complainant is entitled to a decree requiring the defendants to interplead touching the question in dispute.

Lord Redesdale has declared that the right to exhibit an interpleader bill exists when two or more persons claim the same thing by different or separate interests, and another person, not knowing to which of the claimants he ought of right to render a debt or duty, or to deliver property in his custody, fears he may be hurt by some of them. *Mitf. Eq. Pl. *59.* The spirit of the equity of the complainant is that being, so far as his own acts are concerned, under a single liability only, he is yet subject to be vexed by more than one claim. Where the com-

plainant has the thing in dispute in his custody, or admits his obligation to pay, but, from the circumstances of the case, is unable to say to whom of two or more, delivery or payment should be made, the practice of the court is liberal in his favor. *Lozier* v. *Van Saun, 2 Gr. Ch. 329.*

The complainant having no interest in the money or thing in dispute, it is inequitable that he should be compelled to take the risk of determining which of the conflicting claims is superior.

In *Wakeman* v. *Kingsland, 1 Dick. Ch. Rep. 114,* Vice-Chancellor Van Fleet held a bill of this character, where the claims were obviously variant in amount and some of them legal and some equitable, to be a strict interpleader bill, upon the ground that the fund was insufficient to pay all the claims, which were uncertain and disputed, and that the complainant was an indifferent stakeholder, ready to pay the fund to the claimants whenever their respective rights could be determined.

If the determination of the dispute between the defendants will settle the claim of each against the complainant, they should be compelled to litigate with each other, the complainant having no interest save the rightful distribution of the fund.

Conflicting claims of this character may arise wholly because of the acts or omission of the contesting parties, and wholly without the fault or even the participation of the complainant, yet unless this court protects him he may be subjected to actions at law by each claimant and be obliged to defend many suits at great disadvantage (for the defence of the one would probably give points for the prosecution of the others), though all the while the complainant stands ready to pay out all of the money in dispute if only he knows the portions to which each contestant is entitled. Plainly, in such case, the complainant has an equity to bring all claimants into court, and delivering the fund, to say, "I have no quarrel with any of you; dismiss me and settle your disputes among yourselves."

The same difficulty and right to relief may happen when the complainant employs two or more persons to do work upon a common object, under an agreement that each shall be paid

according to the amount of the work he may separately do, to be ascertained by measurement when the work shall be completed, and without fault of the complainant, a confusion of the work done arises which prevents an ascertainment of the amount separately done by each, so that the complainant cannot safely pay either.

This is the case under consideration. The work agreed to be done by each of the claimants was the filling in of League Island with mud and sand from the Delaware river. It is undisputed that they, though contracting separately, each agreed to engage in doing the same work, at the same time, in substantially the same way, for a compensation to be ascertained by measuring after completion of the work separately done by each. Each knew that the other was so engaged, and that the work of each was to be so measured when in place. Each knew that if by his act the means of measurement in place was destroyed or interfered with, a confusion would arise which would probably lead to conflicting claims as to the quantity of cubic yards each had deposited. Stevens, after he began the work, consented in writing that Somers should be employed, and therefore knew the whole situation in advance. Somers denies for his company that it had knowledge of this consent, and that it formed the basis of Packard's subsequent agreement with him. The weight of the evidence indicates that the consent was in fact read to him, as an explanation and justification for engaging him to undertake the work which he had formerly competed for but had failed to secure. He knew Stevens had underbidden him and secured the work, and it was entirely natural and reasonable that when he was invited to aid in hastening it, he should be assured that Stevens, who held the contract for doing it, assented to his employment.

But whether Somers knew of Stevens' consent or not, the character of the work itself, on the ground, was so extensive and apparent, in the nature and size of the territory being operated upon and the machinery and its performance in actual use, that the fact that Stevens was actually doing it was manifest to Somers when he first began to work.

Somers' contract did not exclude Stevens from going on with the work. On the contrary, it was supplementary to that of Stevens, and Somers was taken off the work without objection by him, when by his aid it had been advanced according to the requirements of the government officers.

Nothing in the contract of either specified that he should fill in any prescribed part of the island, nor that any wall or line of separation should be put up by Packard for their benefit. When they began, and for some short time afterwards, the evidence indicates that it was within their power, by the action of either or both, to have erected such a wall or bank north and south across the island as would have effectually kept the deposits of each to the east or west of the wall. Their contracts provided for measurement in place. They knew this during the whole of their working period, and should have so deposited their material that commingling would be prevented and that separate measurement in place would be possible. The very nature of the case and the operation of the work made it apparent to both of them that this could not be done unless a barrier of separation of their deposits was constructed and maintained as the work progressed.

It is also plainly shown that Mr. Somers knew all the facts which threatened the confusion, for he anticipated that result and appreciated its attendant embarrassments. He testified that he complained to Mr. Packard about it. He does not claim, nor does Stevens, that Packard had, in agreement with either, contracted in any way that he would erect a separating barrier. Packard did suggest that Somers should build a fence to keep the deposits apart, but this was after both the contracts had been made and both Stevens and Somers were actually at work, so that this suggestion was no part of either of Packard's agreements. In making it he was a mere volunteer. Had his advice been effectually carried out by Mr. Somers it is probable that the confusion would have been prevented. Mr. Somers built the fence to stop the intermingling and plainly intended that this should be the line of separation of the deposits. This fence which he built was, if unsupported, obviously insufficient

and was in part broken down by his own act in depositing so great a quantity of mud and water on one side only that an opening was made in it within about ten days after it was erected.    Had material been deposited on both sides of the fence, gradually raising a supporting bank as the filling progressed, there would have been no breach, and it would have made a complete instead of a partial line and barrier between the two "fills."

Mr. Stevens contributed his share to the confusion by pouring the filling material from his machines upon his end of the island in such condition that it mingled indistinguishably with that deposited by the Somers machines.    The soft mud and water ran together near the sluice at the north side and formed a pond of some acres in extent while both sets of machines were working and for some days after they ceased.    Mr. Stevens did nothing to prevent this confusion.    He appears to have accepted the fence which Somers built as a separating line, but he himself erected neither bank nor fence.    He did not attempt to support Somers' fence nor did he in any way seek to preserve the identity of his own deposit.    The situation and its inevitable consequences were in plain view.    His inaction with knowledge of all the facts was as negligent as Somers' insufficient action.    Both contributed to the production of the consequent result.

The whole work done has been measured in place by the United States engineers, as was agreed by Stevens in his contract and by Somers in his.    Both of them affirmatively admit that this measurement of the whole in place is accurate.    Each agreed that his own compensation should be ascertained by measurement in place of the amount he deposited.    It follows that the total number of cubic yards for which the complainant must pay cannot exceed the total number of cubic yards measured in place.    But Somers and Stevens, while admitting that there was deposited in whole no more than is estimated by the engineers, each claims to have deposited such a number of cubic yards measured in place that their aggregate far exceeds the whole amount of the engineers' estimate.    This result happens because of the intermingling of their deposits as above stated,

each claiming to have pumped all the material on his own side of the fence, and in addition, a considerable quantity which each claims flowed to the other side of the fence. Such a situation makes it impossible for Packard to satisfy either claim without subjecting himself to the danger of loss by recovery on the other.

It is contended by the counsel for Mr. Somers that where the claims made by the defendant are of different amounts, they can never be identified, and that therefore there can be no inter-pleader, and the *dictum* of Vice-Chancellor Shadwell, in *Glyn* v. *Duesbury, 11 Sim. 139,* is cited. This declaration is true only where each party claims that a single undivided sum in the hands of a custodian or stakeholder is wholly payable to him. In such a case the variance in amount would show that one party's claim was not in conflict with the other. But in cases where claims are for unliquidated damages, each defendant might allege a different value and claim a different amount, and yet interpleader would be the proper remedy. *Pom. Eq. Jur. 1323, note 1.* So, in cases where a fund being in complainant's hands, the whole is claimed by one defendant and parts by others, or where the aggregate of all the claims exceeds the full amount of the fund. *School District* v. *Weston, 31 Mich 85.* Additional illustrations may be found in the many interpleader suits in this court, under the Mechanics' Lien act, when the contract is filed, and noticing creditors and holders of equitable assign-ments are brought in because their claims upon the contract price conflict. In these cases the claims often vary widely in amount, and sometimes involve little other dispute than a settle-ment of the order of their priority, yet if the situation be such that the contract price is not enough to pay all and the owner may be compelled to determine the order of priority of payment, it is common practice in this state to settle the rights of all the claimants under an interpleader bill. In the following cases there were claims for different amounts made in interpleader cases which were entertained in this court : *Superintendent and Trustees of Trenton Schools* v. *Heath, 2 McCart. 22 ; Wakeman* v. *Kingsland, 1 Dick. Ch. Rep. 113; Lanigan* v. *Bradley, 5*

*Dick. Ch. Rep. 202;* Board of Education v. *Duparquet, 5 Dick. Ch. Rep. 234.*

In this case under consideration each of the defendants contracted separately to work on the same employment, and each contract specified a mode of estimating their compensation, which required an ascertainment of the number of cubic yards of material which each deposited in place. Each knew that the other was to be so paid. Each then contributed to the creation of a confusion in the deposit, which prevented an exact ascertainment of the number of cubic yards which he had put in place. This confusion, though without fraud on the part of either defendant, was occasioned by the fault of both, and is well exhibited by a slight variation of the illustration used by the counsel for the complainant. The defendants both took the risk of commingling, as would two farmers who should bring their wheat to a warehouse, and when one, with the knowledge of the other, had put up a manifestly insufficient barrier between, they should dump their wheat day after day in two, at first separate, but ever-increasing heaps, until the barrier yields in part and their several deposits in part commingle. The result was certain and obvious from the beginning.

In the case in hand each party in fault now seeks to compel the complainant, who contributed nothing to create the confusion, to pay for such a quantity of cubic yards of material in place that the total for which payments is claimed by the two exceeds the admitted aggregate amount deposited. The complainant is thus, without fault on his part, subjected to the risk of these conflicting claims.

The defendant Somers also claims that the contracts with the claimants are independent, and that there is no privity. The weight of the evidence shows, as stated, that each party, with the knowledge or assent of the other, contracted to take employment on the same undertaking, and for payment on the basis of the total work done. They are now in dispute as to the amount of work which each contributed toward the total. Though their contracts are several, they are not independent. If Somers is entitled to be paid for the number of cubic yards which he

Packard *v.* Stevens.

claims to have deposited, then Stevens cannot be entitled to be paid for the number for which he claims, and *vice versa.* The complainant is willing to pay for the total of the work done, but cannot safely decide to what amount of that total each party is entitled. If the dispute between the defendants were settled, there would be no dispute remaining between either of them and the complainant.

I will advise that the complainant is entitled to a decree of interpleader and injunction, according to the prayer of his bill.

The question yet to be determined is the respective rights of the defendants to payment for work done by each in filling in the island, the total work on which is undisputed. It has been above shown that the claims of these parties so conflict that necessarily they cannot both be correct. Each insists that his own claim is first and true, and each denies these qualities to the other. They have on the hearing of the cause taken their several answers to be their mutual interpleadings, under the modern practice, and have submitted their proofs and arguments touching the amounts respectively due to them. Both are agreed, as stated, that the total sum to be paid for the work should be estimated by the total number of cubic yards measured in place. Both are agreed that the total number of cubic yards measured in place is that stated by the government engineers. The whole contention lies between the parties defendant in their dispute as to the number of cubic yards which each put in place.

There is, however, a substantial agreement in the evidence of both claimants by which each of them has recognized the location of the cross-bank and fence as a base line, delimiting with reasonable certainty the place of deposit of the material respectively pumped by each, that pumped by Somers being to the westward and that by Stevens to the eastward of the fence. This line of the cross-bank and fence was ascertainable, and was used by the government engineers in their calculation of the amount in place on each side of it. Each claimant insists that this line was absolutely final to delimit his opponent, but that it was subject to an exception in his own favor, because he contends that while there was no overflow from his opponent's to his side

· of the fence there was a large overflow from his side to his opponent's. Each, therefore, sets up an exception to an admittedly efficient line of division, and each must carry the burden of proving with sufficient certainty the exception for which he contends.

The proofs clearly show that there were overflows and that they came at irregular intervals from both sides of the fence line. Necessarily, it is the difference between these overflows, in favor of one party or the other, which should be allowed. Both parties have attempted to define the quantity of overflow by the observation and estimation by witnesses of the material which passed from either side of the fence to the other as the work progressed, or while the deposits consisted of soft and watery material, which afford little certain proof upon which to determine the place measurement.

One witness based his estimate of an overflow upon measurements made to a considerable extent with a tape line and a slender stake, in places where the water covered a large area. He probed his stake into the ground under water until he could push it no farther, and used the depth thus ascertained as a basis for computing the quantity of cubic yards in place. He could not possibly determine by measurement of such material, which machines pumped the soft mud on which he was estimating, nor could he with any accuracy fix its quantity, still less state what it would measure in place when dry. He confessedly introduced allowances because of these conditions, which he denominated "factors of safety," the percentages of which he could not state, which makes his estimate little more than a guess.

It was insisted for Mr. Somers that an ascertainment of the respective quantities put in place could safely be made by estimating the scow loads of material dumped into the basins from which the respective machines pumped. The government officers, for the purpose of making payments as the work progressed, estimated upon this basis and advanced payments, making allowances for loss and shrinkage, and adjusting balances according to a later actual place measurement. The officers found the method

Packard v. Stevens.

to produce results widely variant from the actual place measure-
ment and to require re-adjustment of large differences.  This
method of calculating the amount deposited necessarily involves
the following uncertainties against which " factors of safety " of
unknown value must be introduced : Loss of dumped material
by flowage before pumping; variances in the solidity of the
dumped material delivered at the basins ; differences in the char-
acter and working of the machines as to solidity of material
they pumped, and variances in the shrinkage .after. depositing
dumped material on the island.  Nothing in the proofs enables
these uncertainties to be overcome.  The method proposed is
also directly disadvantageous to Mr. Somers, as he claims to
have dumped upon his end of the island a large amount of
material from the navy yard dock, which was not dumped by
the scow load, but consisted of a deposit which had naturally
accumulated in the dock.  The amount of this dock material
placed on the island by Somers was not separately measured,
but is within the engineers' estimate of the total quantity in
place, and no calculation by number of scow loads brought to
the basins would include it.  Mr. Somers claims that he should
be specially allowed for this dock-pumping, on conjectures wholly
without certainty as to how much it would measure when in
place.  Furthermore, both contracts provide in express terms a
method for the ascertainment of the amount of work done by
each—i. e., by actual measurement in place—and this term
should be followed, unless by agreement or necessity another
more certain mode must be substituted.

Upon a careful examination of all the testimony no method
of computation appears which can be applied in this case which
will, with reasonable certainty, fix the amount of material that
overflowed from either side of the fence and cross-bank to the
other.  Neither party establishes the exception for which he
contends with enough certainty to enable its quantity and value
to be ascertained.  The result is that neither claim can be allowed,
and each party must himself be bound by that line which he
recognizes as correct, saving the exception in his own favor, which
he alleges but fails to prove.  The location of the cross-bank

and fence were visible, as above shown, when the government engineers calculated the amount of material in place, and they have stated the quantity on each side of that line. The accuracy of this calculation is not substantially disputed by the evidence of either side. All the proofs show that Somers vented all his material on the westerly side of the fence and Stevens all of his on the easterly side, and that very much the greater portion so deposited by each stayed on that side of the fence on which it was vented.

The failure to prove the amount of the overflow beyond the line of the fence leaves that line the only delimitation which affords any reasonable certainty for computing the quantity of cubic yards which each defendant deposited when measured in place.

I will advise a decree that the defendant Stevens is entitled to be paid at the price named in his contract for that number of cubic yards of material shown by the calculation of the United States engineers to be in place on the easterly side of the line of the fence and cross-bank, and that the defendant the Hydraulic Dredging and Improvement Company (Mr. Somers' company) is entitled to be paid at the price named in his contract for that number of cubic yards so shown to be in place on the westerly side of that line, debiting each with payments heretofore made on account of the work by them respectively done.